CHARLES MEADOWS, Plaintiff-Appellant, v. STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Defendant-Appellee.

Fifth District   No. 5—91—0579

Opinion filed November 24, 1992.

Michael J. Hanagan, of Hanagan & Dousman, of Mt. Vernon, for appellant.

William Kent Brandon, of Brandon, Schmidt & Palmer, of Carbondale, for appellee.

PRESIDING JUSTICE GOLDENHERSH delivered the opinion of the court:

Plaintiff, Charles Meadows, was issued insurance on his 1987 Ford Escort by defendant, State Farm Mutual Automobile Insurance Company, through its agent, Hugh Frailey. On December 23, 1987, while the policy was in effect, plaintiff was involved in an accident. Although plaintiff was not at fault, the other driver's insurance policy apparently did not cover the costs of plaintiff's injuries and damages. On August 15, 1989, plaintiff filed a complaint for declaratory judgment against defendant alleging that defendant breached its duty to make a proper offer of uninsured motorist coverage to plaintiff, which resulted in plaintiff being denied the opportunity to purchase underinsured motorist coverage. Plaintiff sought reformation of the contract of insurance to include underinsured motorist coverage in an amount equal to the maximum amount of bodily injury liability offered by defendant on the date his policy was issued or last renewed before the collision. Following a bench trial, the court entered judgment on plaintiff's complaint in favor of defendant and against plaintiff finding, in pertinent part:

"2. That the Complaint fails to allege the necessity of reconstructing the insurance contract and that it fails to allege that plaintiff suffered damages from an uninsured or underinsured motorist.

3. In any event, plaintiff fails to meet the burden of proof that the defendant failed to adequately advise the plaintiff of the availability of uninsured motorist coverage; to the contrary, defendant satisfies in the alternative that plaintiff through his spouse was fully advised of available coverage and plaintiffs rejected same."

Plaintiff appeals from this judgment. In this cause, plaintiff raises two issues: (1) whether the trial court erred in finding defendant made a proper offer of uninsured motorist coverage to plaintiff, and (2) whether the trial court erred in finding plaintiff's complaint insufficient as a matter of law. We reverse and remand.

Plaintiff purchased the automobile insurance policy from defendant in July 1987, immediately following his purchase of a new Ford Escort. Plaintiff called defendant's agency in Benton which is owned by Hugh Frailey. Plaintiff cannot remember to whom he spoke about an insurance policy for his new car, but he remembers it was either Mr. Frailey or Mr. Frailey's secretary, Liz Roberts. The person he spoke to at the agency informed him that the Ford dealership where

he purchased the car had already called and given all the necessary information. Plaintiff was informed that all he needed to do was to sign the contract of insurance and pay the premium. Plaintiff testified that during this conversation, the subject of uninsured and underinsured coverage was never discussed.

Plaintiff's wife went to the agency the next morning and spoke to Liz Roberts. The application had been previously completed by someone at the agency. Liz Roberts put the application in front of Mrs. Meadows and told her where to sign. Mrs. Meadows inquired as to whether she should sign her own name or her husband's. Liz Roberts told her she could sign her husband's name. Mrs. Meadows did not read the forms given to her for her signature. She signed both the application form and the Illinois uninsured/underinsured motor vehicle coverage selection form (selection/rejection form) using her husband's name. The selection/rejection form had also been previously filled out. It provided, in pertinent part:

"This is to certify that:

I have been provided the opportunity to purchase Uninsured Motor Vehicle Coverage and Underinsured Motor Vehicle Coverage up to an amount equal to my automobile Bodily Injury Liability limits, and instead I select lower limits of
$ _____15_____ , _____30_____

Notice: if the limits selected are the minimum required by law (Section 7—203 of the Illinois Vehicle Code), no underinsured motorist insurance will be included in the policy if the limits selected above exceed the minimum limits required by law. Underinsured Motor Vehicle Coverage will be included in an amount equal to the total amount of Uninsured Motor Vehicle Coverage."

At this time, Mrs. Meadows also wrote a check for the premium and gave it to Liz Roberts.

Hugh Frailey testified that he follows a standard procedure in discussing coverage with clients. He gives a general explanation concerning underinsured and uninsured motorist coverages. He explains that the law in Illinois requires policy holders to carry certain minimum amounts of coverage. Mr. Frailey recommends that a policy holder carry uninsured and underinsured motorist coverage equal to his or her liability limits for bodily injury. Plaintiff's exhibit No. 3, a portion of Mr. Frailey's discovery deposition, was admitted pursuant to Supreme Court Rule 212(a) (134 Ill. 2d R. 212(a)). It reads, in pertinent part:

"Q. What is it you tell them about the uninsured motorist coverage?

A. About your uninsured motorist, correct?

Q. Yes, the UM coverage.

A. Okay. In the event that they are involved in an accident and an uninsured motorist, you know, is at fault, the uninsured motorist coverage gives them medical coverage for, you know, 50,000 per person, 100,000 per accident. In other words, the person that hits them does not have insurance, this is where we will pay for their medical bills.

The underinsured motorist coverage, if the other person has insurance, but they don't have enough insurance to cover, you know, whatever their medical bills are, the underinsured comes in and picks up where theirs left off, basically.

Q. Okay. Now, is there anything else that you tell them about the uninsured motorist coverage? Just want to talk about uninsured right now. Other than what you've told me, what else do you tell them, if anything, about the purpose of that uninsured motorist coverage?

A. That's exactly what we tell them."

Mr. Frailey had 1,525 active auto policies, as well as many other active fire and health policies at the time of trial. He could not specifically remember talking to plaintiff about the policy issued on plaintiff's 1987 Ford Escort. Mr. Frailey allows Liz Roberts to explain coverages to potential policy holders.

Liz Roberts agreed that she explains coverages to customers when Mr. Frailey is unavailable. She does not remember if she spoke to Mrs. Meadows concerning coverage on a 1987 Ford Escort. A portion of Liz Roberts' discovery deposition was also introduced into evidence pursuant to Supreme Court Rule 212 (134 Ill. 2d R. 212). The following is Liz Roberts' explanation of both uninsured and underinsured coverages:

"Q. And what do you tell them uninsured motorist coverage does?

A. Okay. Uninsured covers them for bodily injury if they have an accident with someone who is uninsured.

Q. Okay. What sort of things does it pay for?

A. Hospital, bodily injury.

Q. Okay. What about underinsured motorist coverage, what do you tell them about that when they first—first time customer, what would you tell them normally?

A. Underinsured, that portion of their policy, if they wish to purchase it, covers them if they are injured in an accident with someone that is insured, but doesn't carry enough.

Q. Okay. And what sort of things would the underinsured pay for?

A. The underinsured?

Q. The underinsured, yes.

A. All right. That portion of their policy picks up where the person that has done the bodily injury policy leaves off. And it pays up to the limits of their policy.

Q. Okay. For what things though, medical bills, lost earnings?

A. Medical.

Q. Would it pay for lost earnings?

A. I'm not sure about that.

Q. Okay. What about disability or things like that that are not medical bills, would the underinsured pay for that?

A. I'm not sure.

Q. Okay.

A. I'm not sure.

Q. Now, let me go back to the uninsured motorist coverage and ask you, you said that uninsured motorist coverage would pay for, for example, it would pay for medical bills if a person was hurt because an uninsured driver hurt them?

A. Right.

Q. Okay. Other than paying for medical bills, would it pay for any other things such as lost earnings?

MR. BRANDON [defendant's counsel]: She answered that question. She said it would pay for bodily injury. Now, if you want her to go beyond that point, she can try, but she answered your question.

Q. (MR. HANAGAN [plaintiff's counsel] CONTINUING) Mrs. Roberts, do you know what I'm asking you here, about whether uninsured motorist coverage would cover someone for time lost from work?

A. I'm not sure."

Two additional witnesses also testified at the hearing. Mrs. Kathy Swigonski, who is also insured by defendant through the Frailey Agency, testified that when she bought a new car in 1987, Mr. Frailey merely transferred the policies from her old car to her new car and did not discuss either uninsured or underinsured motorist coverages with her. Mrs. Swigonski testified that "somewhere down the line"

someone from the agency did discuss uninsured coverage with her, but not at the time she acquired the coverage.

Mrs. Diane Lynn Bange, operations superintendent for defendant in Bloomington, checked the Meadowses' records. She found renewal documents regarding a 1983 insurance policy. In 1983, defendant sent the Meadowses a renewal notice and included an insert regarding an offer to increase uninsured and underinsured motorist coverages. The Meadowses did not seek a change in coverage at that time. Defendant's records did not show a similar offer was made with regard to their 1987 policy.

## I

The first issue we are asked to consider is whether the trial court erred in finding defendant made a proper offer of uninsured motorist coverage to plaintiff. Plaintiff argues defendant had a statutory duty to offer uninsured motorist coverage and that defendant failed to properly offer that coverage. Had defendant complied with its statutory duty to offer uninsured motorist coverage, plaintiff could have obtained underinsured motorist coverage at the same amount. Because defendant failed to properly offer uninsured motorist coverage, which in turn prohibited plaintiff from purchasing underinsured motorist coverage, the policy should be reformed to include underinsured motorist coverage at the maximum bodily injury amount offered by defendant at the time the policy was issued or renewed. Defendant responds it gave plaintiff enough information concerning both uninsured and underinsured motorist coverage to allow plaintiff to make an intelligent decision and, therefore, did not breach its statutory duty to offer plaintiff uninsured and underinsured motorist coverage. We agree with plaintiff.

■ In order to understand the case before us, it is necessary to examine certain statutory requirements concerning both uninsured and underinsured motorist coverage. In recent years the General Assembly has made several changes to statutes which require that certain types of coverages be included in all automobile insurance policies. (For a review of these changes, see *DeGrand v. Motors Insurance Corp.* (1992), 146 Ill. 2d 521, 588 N.E.2d 1074.) At the time in question, the following provisions requiring uninsured and underinsured motorist coverage were in effect. Section 143a—2 of the Illinois Insurance Code (the Code) stated, in pertinent part:

> "(1) Required offer of additional uninsured motor vehicle coverage. No policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any per-

son arising out of the ownership, maintenance or use of a motor vehicle shall be renewed or delivered or issued for delivery in this State with respect to any motor vehicle registered or principally garaged in this State unless uninsured motorist coverage as required in Section 143a of this Act is offered in an amount up to the insured's bodily injury liability limits.

\* \* \*

(5) On or after July 1, 1983, no policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle shall be renewed or delivered or issued for delivery in this State with respect to any motor vehicle registered or principally garaged in this State unless underinsured motorist coverage is included in such policy in an amount at least equal to the total amount of uninsured motorist coverage provided in that policy where such uninsured motorist coverage exceeds the limits set forth in Section 7—203 of the Illinois Vehicle Code." Ill. Rev. Stat. 1985, ch. 73, pars. 755a—2(1), (5).

Section 143a—2(1) of the Code requires that no policy may be issued or renewed unless uninsured motorist coverage is offered in an amount up to bodily injury limits. Section 143a—2(5) provides that after July 1, 1983, no policy can be issued or renewed unless underinsured coverage is included in an amount at least equal to the uninsured motorist coverage where the uninsured motorist coverage exceeds the statutory minimum. Therefore, if an insurance company has properly offered uninsured motorist coverage, and if the customer has chosen an uninsured limit higher than the minimum required by law, the insurance company has a duty to issue underinsured motorist coverage in an amount equal to the uninsured motorist coverage. (*DeGrand*, 146 Ill. 2d at 529-30, 588 N.E.2d at 1078-79.) The question here is whether defendant made a proper offer of uninsured motorist coverage to plaintiff.

■ The parties agree that the proper test to determine the sufficiency of an offer of optional coverage has been set forth in *Cloninger v. National General Insurance Co.* (1985), 109 Ill. 2d 419, 488 N.E.2d 548. In that case, our supreme court studied the legislative history of section 143 of the Code to determine what the General Assembly meant by the term "offer." The *Cloninger* court found:

"The language of section 143a—2(3) and the legislative debates surrounding its passage, as well as the passage of its predecessor, section 143a—1, indicate that the legislature rec-

ognized that soaring medical costs often left injured parties only partially compensated for their injuries. The legislature was obviously concerned with adequately compensating injured parties. As stated by Representative Epton during a House debate on what would later be codified as section 143a—2(3): '[T]his Bill is in behalf of the consumer.' House Debate, June 20, 1980, at 48.

The legislature not only required that underinsured-motorist coverage be offered but also provided that the insured had a right to elect or reject such coverage. (Ill. Rev. Stat. 1981, ch. 73, par. 755a—2(4).) The right to elect or reject such coverage requires that the insured have information regarding the coverage. (*Tucker v. Country Mutual Insurance Co.* (1984), 125 Ill. App. 3d 329[,465 N.E.2d 956].) Therefore, we believe that the legislature intended that the 'offer' mandated in section 143a—2(3) provide the insured with enough information regarding underinsured-motorist coverage to allow the insured to make an intelligent decision of whether such coverage should be elected or rejected. Such an intelligent decision cannot be made unless an explanation of the coverage is supplied. See *Tucker v. Country Mutual Insurance Co.* (1984), 125 Ill. App. 3d 329, 333-34[, 465 N.E.2d 956, 959-60]." (109 Ill. 2d at 424-25, 488 N.E.2d at 550.)

The *Cloninger* court went on to adopt a four-part test to determine whether an offer of optional coverage was adequate. In order to satisfy the requirements of section 143a—2 of the Code, an offer must (1) notify the insured in a commercially reasonable manner if the offer is not made in face-to-face negotiations; (2) specify the limits of the optional coverage without using general terms; (3) intelligibly advise the insured of the nature of the option; and (4) advise the insured that the optional coverage is available for a relatively modest premium increase. 109 Ill. 2d at 425-26, 488 N.E.2d at 550.

Plaintiff argues that defendant did not comply with part three of the test because plaintiff failed to explain uninsured motorist coverage to either plaintiff or his wife. Moreover, plaintiff contends even if defendant discussed uninsured motorist coverage with plaintiff or plaintiff's wife in general terms, as defendant's agent, Hugh Frailey, and Hugh Frailey's secretary testified, their testimony showed they actually misunderstood uninsured motorist coverage and therefore misrepresented that coverage when discussing it with clients.

Neither plaintiff nor his wife remembers having a discussion with defendant's employees about uninsured motorist coverage for their

1987 Ford Escort prior to acquiring such coverage. Plaintiff called the agency to obtain insurance for his new vehicle and talked to someone at the agency who told him that the agency had already received a call from the car dealership which gave the agency the necessary information in order for plaintiff to obtain insurance. The person who answered the phone told plaintiff that all that was necessary was for someone to stop by the agency, sign the papers, and pay the premium. Plaintiff's wife testified that she went to the agency and talked to Liz Roberts. Plaintiff's wife paid the premium and signed the forms, one of which was the selection/rejection form. Plaintiff's wife, however, recalls that at the time she signed the insurance forms, she thought the selection/rejection form was just part of the application. Plaintiff's wife could have read what she was asked to sign. Instead, she relied on the insurance company to have completed the forms correctly. Moreover, plaintiff's wife was aware that her husband had already talked to the agency about insurance for the new car, so she assumed that there was nothing for her to do but sign the papers and pay the premium. She did not go to the agency with the intention of discussing or choosing coverages, as she believed her husband had already completed those tasks.

■ The instant case is analogous to *Holland v. State Farm Mutual Automobile Insurance Co.* (1991), 216 Ill. App. 3d 463, 576 N.E.2d 981. In *Holland,* the plaintiff testified she had been insured by another insurance company and had sought a price quote from the defendant's agent in an attempt to lower her premium payments. The only coverage which was discussed during this conversation was medical pay. The plaintiff had no recollection of discussing with her new insurance agent uninsured or underinsured motorist coverage. Because the defendant's agent offered the plaintiff a lower premium, the plaintiff changed insurance companies. The plaintiff was later hit by an uninsured driver and sought reformation of the insurance contract to include additional uninsured motorist coverage. The defense offered proof that the plaintiff had executed a document acknowledging her rejection of uninsured motorist coverage up to an amount equal to her bodily injury liability limits and choosing instead the minimum amounts of $15,000 per person and $30,000 per occurrence. The plaintiff stated she signed it only because she "probably thought it was part of the application." (216 Ill. App. 3d at 466, 576 N.E.2d at 983.) The trial court ruled in the plaintiff's favor, finding that the defendant had failed to satisfy the requirement that it had intelligibly advised the plaintiff as to the nature of the optional coverages. Our colleagues on the First District Appellate Court affirmed but never

specifically mentioned the selection/rejection form. Instead, *Holland* focused on the credibility of the witnesses, namely, that the defendant's agent's testimony concerning his usual procedures about discussing coverages was contradicted by the plaintiff and that the defendant had no specific instructional procedure at the time for advising new insureds of the optional coverages which had only three months previously been changed by the General Assembly. (216 Ill. App. 3d at 468, 576 N.E.2d at 984.) The *Holland* court did not find the plaintiff's signature on the selection/rejection form indicative of her intention to select the minimum coverage and did not find the form constituted an offer within the meaning of *Cloninger*. Likewise, under the facts of the instant case, we conclude that the selection/rejection form does not meet the statutory requirement that the insurer must intelligibly advise the insured of the nature of the optional coverages.

Additionally, even if plaintiff or his wife had been advised of the opportunity to select uninsured motorist coverage, the information offered by defendant's agent was incorrect. The deposition testimony of Hugh Frailey, recited in our statement of facts, shows that Mr. Frailey advised his clients that both uninsured and underinsured motorist coverage pays only for "medical" bills. Some responses elicited by defendant's attorney later in the deposition do not cure Hugh Frailey's defective response. Mr. Frailey was given the opportunity by plaintiff's attorney to elaborate and further explain what uninsured and underinsured coverage pays for, but he unequivocally stated that that is exactly what he tells potential insureds. As plaintiff points out, this explanation would leave most people with the impression that if they have medical insurance through an employer or through a private insurer, the minimum uninsured coverage would be sufficient to meet their needs. Mrs. Roberts' deposition testimony shows she does not understand what types of damages are covered by uninsured and underinsured motorist coverages.

Defendant next contends that because plaintiff purchased uninsured and underinsured motorist coverage equal to the bodily injury limits on a motorcycle he insured with defendant in 1981, it can be inferred that those coverages were explained to him and that he fully knew what he was purchasing in 1987. The law is clear, however, that no insurance policy can be issued or renewed unless uninsured motorist coverage is "offered" in an amount up to the insured's bodily injury liability limits. Ill. Rev. Stat. 1985, ch. 73, par. 755a—2(1).

In this appeal, defendant made a motion to cite additional authority. We granted defendant's motion and have considered *DeGrand v. Motors Insurance Corp.* (1992), 146 Ill. 2d 521, 588 N.E.2d 1074, pre-

viously citing it herein. In *DeGrand*, our supreme court determined that the 1982 statute did not require insurers to offer underinsured motorist coverage to automobile purchasers who opt for uninsured motorist coverage at the minimum statutory level. In *DeGrand*, there was no issue as to whether the defendant had opted for the minimum amount of uninsured coverage. The defendant had chosen the minimum amount of coverage, and therefore, the insurer was not required to offer underinsured motorist coverage. (146 Ill. 2d at 535, 588 N.E.2d at 1081.) Here, plaintiff was never given the opportunity by defendant to choose uninsured motorist coverage. No meaningful offer was made. The forms were previously filled out upon plaintiff's wife's arrival at the agency and both plaintiff and his wife testified that they did not discuss uninsured or underinsured motorist coverage with defendant's agent prior to being issued the policy on their Ford Escort. If an explanation had been given, it was clearly incorrect.

We are mindful that a reviewing court cannot substitute its judgment on such matters unless the findings of the trial court are clearly against the manifest weight of the evidence. (*MBL (USA) Corp. v. Diekman* (1983), 112 Ill. App. 3d 229, 445 N.E.2d 418.) We conclude that plaintiff has met that burden and has convinced us that the trial court's findings were against the manifest weight of the evidence.

## II

The next issue we must address is what amount of reformation should be ordered. Plaintiff contends that we should reform the insurance policy to provide underinsured motorist coverage in an amount equal to the maximum bodily injury liability protection offered by defendant at the time the contract was issued or renewed. In support of its position plaintiff cites *Logsdon v. Shelter Mutual Insurance Co.* (1986), 143 Ill. App. 3d 957, 493 N.E.2d 748. Defendant responds that the maximum amount of underinsured motorist coverage which can be implied by law is the amount of bodily injury liability coverage actually selected by the insured. In support of its position defendant cites *Fuoss v. Auto Owners (Mutual) Insurance Co.* (1986), 148 Ill. App. 3d 526, 499 N.E.2d 539, *aff'd* (1987), 118 Ill. 2d 430, 516 N.E.2d 268, and *Overbey v. Illinois Farmers Insurance Co.* (1988), 170 Ill. App. 3d 594, 525 N.E.2d 1076.

Defendant is correct that we previously considered this issue in *Fuoss*, wherein we reformed an automobile insurance policy to include underinsured motorist coverage in an amount equal to bodily injury liability limits selected by the insured. Because the plaintiff in *Fuoss* had already recovered from the person who hit him in an amount in

excess of his own bodily injury limits, the reformation was a nullity and the summary judgments entered by the trial court were affirmed. *Fuoss*, 148 Ill. App. 3d at 535, 499 N.E.2d at 545.

As pointed out by our colleagues on the Second District Appellate Court, the conflict between our own district and the Third District in *Logsdon* was resolved by our supreme court in its review of our decision in *Fuoss*. (See *Overbey v. Illinois Farmers Insurance Co.* (1988), 170 Ill. App. 3d 594, 604, 525 N.E.2d 1076, 1083.) In *Fuoss v. Auto Owners (Mutual) Insurance Co.* (1987), 118 Ill. 2d 430, 516 N.E.2d 268, our supreme court reviewed the relevant language in section 143a—2 of the Code:

> "Section 143a—2(4) of the Code states: 'The named insured may elect to purchase limits of underinsured motorist coverage in an amount up to *the uninsured motorist coverage on the insured vehicle* * * *.' (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 73, par. 755a—2(4).) It further provides that uninsured coverage may be purchased 'in an amount *up to the insured's bodily injury liability limits.*' (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 73, par. 755a—2(1).) Should we reform Fuoss' policy in accordance with the Code, we could imply coverage at no more than either $15,000/$30,000 (as the circuit court did)—the amount of his uninsured limits—or $25,000/$50,000 (as the appellate court did)—the amount of his bodily injury liability insurance. Under the most favorable reading of the Code, therefore, the defendants would be responsible for paying no more than $25,000 per person, 'less those amounts actually recovered under the applicable bodily injury insurance policies * * * maintained on the underinsured motor vehicle [which in this case is $100,000].'" (Ill. Rev. Stat. 1981, ch. 73, par. 755a—2(3).) Since this $100,000 settlement is greater than the $25,000 maximum Fuoss could collect from the defendants, Fuoss incurred no damage as a result of the alleged violation and thus the circuit judge was correct in granting summary judgment in favor of the defendants." 118 Ill. 2d at 433-34, 516 N.E.2d at 270.

In affirming our decision in *Fuoss*, our supreme court ultimately relied on the legislative intent found in the language of section 143a—2 of the Code (Ill. Rev. Stat. 1981, ch. 73, par. 755a—2). While the statute changed somewhat, as previously discussed, the language "in an amount up to the insured's bodily injury liability limits" remains. (Ill. Rev. Stat. 1985, ch. 73, par. 755a—2(1).) As we are bound to follow the applicable decisions of our supreme court, such as *Fuoss*, we conclude that the maximum amount of uninsured motorist coverage

and underinsured motorist coverage implied by law in this case is the amount of bodily injury liability coverage selected by plaintiff.

### III

The other issue we are asked to consider is whether the trial court erred in holding plaintiff's complaint insufficient as a matter of law. Plaintiff contends defendant waived its right to challenge the sufficiency of the complaint by answering and not challenging it until after the trial was completed. Defendant responds that the issue of sufficiency of the complaint was not waived because the issue was submitted to the trial court in defendant's trial brief, which was given to the trial court before judgment was entered.

Section 2—615(a) of the Code of Civil Procedure provides that all objections to pleadings shall be raised by motions which "shall point out specifically the defects complained of, and shall ask for appropriate relief." (Ill. Rev. Stat. 1989, ch. 110, par. 2—615(a).) Section 2—612(c) of the Code of Civil Procedure provides that "[a]ll defects in pleadings, either in form or substance, not objected to in the trial court are waived." (Ill. Rev. Stat. 1989, ch. 110, par. 2—612(c).) "No pleading is bad in substance which contains such information as reasonably informs the opposite party of the nature of the claim or defense which he or she is called upon to meet." (Ill. Rev. Stat. 1989, ch. 110, par. 2—612(b).) Where a complaint substantially but imperfectly alleges a cause of action, the defendant waives any defect by answering it without objection and proceeding to trial (*Galvin v. O'Neill* (1946), 393 Ill. 475, 477, 66 N.E.2d 403, 405; *County of Winnebago v. Willsey* (1970), 122 Ill. App. 2d 149, 258 N.E.2d 138), particularly if the defect could have been remedied by amendment. *Pathman Construction Co. v. Hi-way Electric Co.* (1978), 65 Ill. App. 3d 480, 382 N.E.2d 453.

■ In the instant case, defendant answered plaintiff's complaint, proceeded to trial and defended itself accordingly. It was not until the trial judge requested briefs from the parties that defendant even raised the issue of sufficiency of plaintiff's pleadings. Clearly, the pleadings were not so bad in substance as to require a dismissal, since defendant was able to defend itself at a bench trial. Had defendant raised its objection in a timely manner, the alleged defects could have been cured. Further, we disagree with defendant's contention that plaintiff's lack of initiative in correcting the pleadings once the issue was raised in defendant's trial brief constituted waiver.

While the complaint was defective, those defects could have been cured had defendant raised its objection to the pleadings in a timely

manner, and defendant's failure to raise the issue of sufficiency until it is so argued in its trial brief waived the issue. Therefore, we find that the trial court erred in holding plaintiff's complaint was insufficient, as this issue was waived by defendant.

For the foregoing reasons, the judgment of the circuit court of Franklin County is reversed, and the cause is remanded for proceedings not inconsistent with this opinion.

Reversed and remanded.

CHAPMAN and RARICK, JJ., concur.